# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**ISIAH L. SINGLETON**

                                                **Plaintiff**

**v.**                                      **Case No. 3:21 cv 553**

**MICHAEL L. WADE,**
      **(In his individual capacity as to all counts, and
      in his official capacity as to Count IV)**

**R. G. GOETSCHIUS**
      **(In his individual capacity as to all counts, and
      in his official capacity as to Count IV)**

**RODNEY BUNDICK**
      **(In his individual capacity as to all counts, and
      in his official capacity as to Count IV)**

**JARRELL COOKE,**
      **(In his individual capacity)**

**FARES TADROS**
      **(In his individual capacity)**

**KAIYELL SANDERS**
      **(In his individual capacity)**

**JOHN DOE 1 thru 4**
      **(In his, her, and their individual capacities)**

                                                  **Defendants.**

## AMENDED COMPLAINT

COMES NOW, the Plaintiff, Isiah L. Singleton, by counsel, and moves this Court for judgment against Defendants Michael L. Wade, R. G. Goetschius, and various sheriff's deputies/employees herein identified, as well as John Doe 1-4, states the following:

## I.    INTRODUCTION

1.    Plaintiff, Isiah Singleton (referred to herein as "Mr. Singleton" and "Singleton") was a pre-trial detainee housed in Day Room 228, Cell # 2 of Henrico County Jail West (the "Jail").

2.    During the night and early morning hours of August 24-25, 2019, Singleton was brutally assaulted by two of his cellmates for a prolonged period of time, (upon information and belief the beating itself took place over a period of hours), both of whom were known to be dangerous and one of whom had previously expressed a specific intent to assault, maim, or harm Singleton.

3.    Despite this specific knowledge, the Defendants and/or their agents did nothing to address the matter or arrange for the safety of Mr. Singleton.

4.    Upon information and belief, Singleton, and other inmates housed in the day room who heard and/or saw the prolonged beating, repeatedly called for assistance, but the Defendants failed to aid Singleton.

5.    As a direct and proximate result of Defendants' collective deliberate indifference, negligent and grossly negligent behavior, and negligent supervision, Singleton was knocked unconscious, and left in a heap until he was discovered nearly 4 hours later by a defendant deputy.

6.     Mr. Singleton was so severely beaten that he had to be placed into a medically induced coma for a week, having suffered a fractured skull, multiple facial fractures, a broken jaw, brutally broken and dislocated arm(s), cracked ribs, and excessive blood loss, among other serious and permanently disabling injuries. He will never be the same.

7.     Defendant Wade commented that it was the worst beating he had ever seen.

8.     American Correctional Association (ACA) Standards, to which Henrico County Jail subscribes, dictate that cell checks be performed every thirty (30) minutes. Based on the aforementioned facts and circumstances, more specifically the duration of the beating and unanswered calls for assistance, it is clear that ACA standards were not followed. Had ACA standards been followed, the harm to Mr. Singleton would likely have been prevented or mitigated.

## II.     **JURISDICTION**

9.     Jurisdiction exists in the case pursuant to the Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. 1367 (a) over state law claims.

## III.     **VENUE**

10.     Venue is proper pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

11.     Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.    PARTIES

12.    Plaintiff, ISIAH L. SINGLETON, is currently a resident of South Carolina, but at all times relevant hereto, was a resident of the Commonwealth of Virginia. Mr. Singleton was born in 1978 and is currently 42 years old.

13.    During the relevant period, Defendant, MICHAEL L. WADE, served as the Sheriff of Henrico County. In that capacity, he served as a constitutional officer independent of the County of Henrico. Defendant Michael Wade operated, directed, and supervised the Jail and its deputies, agents and employees. At all times while Singleton was detained at the Jail, Sheriff Wade had the duty to maintain the custody and care of Singleton, and otherwise delegated that duty to his deputies, agents, and employees. At all relevant times, Defendant Wade was acting under color of state law. For purposes of the Plaintiff's civil rights claims, Sheriff Wade was responsible for implementing customs, policies and procedures amongst his deputies and employees to ensure that an inmate's constitutional rights are protected.

14.    Defendant, R. G. GOETSCHIUS, at all relevant times, served as a Lieutenant in the Henrico Sheriff's Department, acted as a supervisor at the Henrico County Jail, and was acting within the scope of his employment and/or agency.

15.    Defendant, RODNEY BUNDICK, at all relevant times, served as a Lieutenant in the Henrico Sheriff's Department, served as watch commander to third platoon (night shift), and acted as a supervisor at the Henrico County Jail. At all relevant times, Defendant Bundick was acting within the scope of his employment and/or agency.

16.    Defendant, JARRELL COOKE, at all relevant times, served as a Sergeant in the Henrico Sheriff's Department and acted as a supervisor at the Henrico County Jail. At all relevant times, Defendant Cooke was acting within the scope of his employment and/or agency.

17. Defendant, FARES TADROS, at all relevant times, served as a Deputy at the Henrico County Jail and worked third platoon (night shift) conducting security checks and other various duties assigned to deputies at the Henrico County Jail. At all relevant times, Defendant Tadres was acting within the scope of his employment and/or agency.

18. Defendant, KAIYELL SANDERS, at all relevant times served as a Deputy at the Henrico County Jail and worked third platoon (night shift) conducting security checks and other various duties assigned to deputies at the Henrico County Jail. At all relevant times, Defendant Sanders was acting within the scope of his employment and/or agency.

19. Defendants, John Doe, at all times were Sheriff's Deputies assigned to Henrico County Jail West, acting within the scope of their employment and under color of state law. Upon information and belief, Defendants Doe are residents of the Commonwealth of Virginia.

## V.  FACTS

### a.  The Assault

20. At the time of the incident that forms the basis for this claim, the Plaintiff, Isiah Singleton was a pre-trial detainee housed in Day Room 228 of the Henrico County Jail, West Facility.

21. Upon information and belief, the day room consists of an open gathering space for inmates and pre-trial detainees to congregate during the day with the liberty to go in and out of their individual cells until designated lockdown at night.

22. The individual cells line the dayroom on two levels, a main level and a balcony, and house as many as three (3) inmates per cell.

23. Singleton was assigned to Cell #2, along with inmates Rodney A. Goode and John Lawrence Ellis, hereinafter Goode and Ellis respectively.

5

24.     On August 24, 2019, at approximately 11:30 p.m., Deputy Tadros and/or Deputy Sanders, under the supervision of Lt. Bundick, were assigned to Dayroom 228 to perform headcount and lockdown duties for the duration of third platoon shift.

25.     Pursuant to American Correctional Association (ACA) Standards, to which the Henrico County Jail subscribes, each Defendant, to include Lt. Bundick, Deputy Tadros, and Deputy Sanders in their respective duties on third shift platoon, had a duty to perform physical cell security checks every thirty (30) minutes.

26.     Upon information and belief, the requisite cell checks were not only not performed after lockdown on August 24, 2019, but routinely were not performed as a course of habit, custom, or policy, for months leading up to the incident forming the basis of this claim.

27.     Additionally, it is believed that Defendants' employed a practice of signing off on "cell checks" when they did not occur at all, or at minimum when they merely peered into the glass of the main day room door as opposed to checking the individual locked cells within the dayroom.[1]

28.     According to multiple witness accounts, shortly after lockdown on August 24, 2019, Singleton "mule kicked" the cell door no less than 4 times, and yelled repeatedly for deputies to open the door because he was being assaulted by inmates Goode and Ellis.

29.     According to these same witness accounts, in addition to the loud banging and screams for help, the brutal assault itself was loud and disturbing, lasting for no less than 3.5 hours.  During which time, the assailants would take intermittent breaks to rest before resuming the attack.

---

[1] Merely peering through the window of the dayroom door is not a cell check by ACA Standards, especially after lockdown when inmates are assigned to individual locked cells within the dayroom itself.

**Inmate witness #1** (Summation)

- Stated he was in the cell immediately adjacent to Cell #2 where the assault occurred.
- The cell he was in was not his cell because everybody goes where they want to.
- The officers (deputies) routinely don't come on to the pod.
- On the night of the assault, 5 to 10 minutes after lockdown (Singleton) started kicking and pounding the door.
- Singleton mule kicked the door at least 4 times. The kicking was so loud it sounded like gunshots.
- Heard Singleton calling for the guards, and yelling that he wanted to "check out"
- The guards never came.
- Ellis was his cellmate the week prior and had gotten into a fight with their other cellmate for having his hands down his pants and he received an institutional charge for that assault. The victim of that fight left the pod.
- They called Ellis "Satan."
- "Satan" was laughing.
- Sounded like a basketball game with sneakers squeaking.
- Heard the heavy storage bin or top hit the floor multiple times.
- The first words he heard Goode say that night after the beating started were "(Expletive) it, we already have street charges, we might as well finish it."
- Heard Satan say, "how is it being able to touch the back of your own head? (Expletive) it, give me the other one, I'm going to break that one too…"
- Heard bones breaking.
- Sounded as if Singleton's head was being banged against the wall; as if they were hanging from the top bunk and kicking Singleton so his head would hit the wall.
- They would get tired and take a break and start beating him again.
- His roommate yelled over to ask what was going on and Satan replied "I pissed in his mouth" and started laughing.
- Remembers Satan saying "R Kelley doesn't have shit on me,"
- This went on for 2 ½ hours or more.
- Guard found Singleton after 3:00 am (clock said 3:18 or so when he noticed)
- Satan came out of the cell covered in blood.

**Inmate witness #2** (Summation)

- In the same dayroom but housed in a cell on the second level (balcony).
- Everyone heard (Singleton) yell for the deputy.
- Heard the ongoing attack.
- Recalls hearing bones breaking

7

**Inmate witness #3**  (Summation)

- Cell was located above the attack.
- Heard Singleton calling for help approximately 20 minutes after lockdown.
- Heard a lot banging and the sound of bunks moving. Recalls hearing the storage container used for their canteen being banged on Singleton.
- The week before, the same kid (Ellis) beat up someone in Cell #1.
- Remembers hearing "shut up before I rape you."
- In the beginning, he was yelling repeatedly "deputy, deputy, deputy open my door."
- Saw Deputy Sanders at the gate at one time, saw him look in and walk away.
- When dude was yelling for the deputy, he also heard someone banging on the door. "He was kicking it real hard."
- Sounded as if the yelling took a break and then he (Singleton) started yelling for the deputy again.
- He heard statements about raping the dude (Singleton) after the second series of yelling for a deputy.
- Heard Ellis ask which arm was he beating his dick with and then heard what sounded like a bone break.

30.     Singleton was discovered by Deputy Fares Tadros, Defendant, just after 3:00 a.m. on August 25, 2019.

31.     Upon information and belief, Tadros was conducting a security check of Day Room 228, the first since lockdown at approximately 11:00 p.m. the night before. When he approached Cell #2, Tadros was unable to see into the cell because paper was covering the cell door window. As a result, he radioed control and asked that the cell door be opened.

32.     Upon opening the door, Tadros observed a cell in disarray, with blood all over the walls and floor. Inmate Goode was sitting on the top bunk and Ellis was standing in the middle of the floor covered in blood. As Tadros entered the cell, Ellis walked by with his hands up and said "I bet y'all will start coming in and doing your cell checks now."

33.     Tadros observed Singleton in a disfigured heap, lying in a pool of blood on the bottom bunk. It was obvious Singleton was suffering from severe injury requiring hospitalization and immediate medical attention. Deputy Tadros made the call for medical,

8

whereupon Sgt. Cooke and Lt. Bundick were the first to respond, taking control of the situation from that point forward.

**b.** **Defendants' Knowledge of Significant Risk of Serious Harm Prior to August 24, 2019.**

34. That Singleton was brutally beaten by Ellis and Goode was not a surprise to the Defendants. Prior incidents involving Goode and Ellis, aa well as facts specific to Singleton informed Defendants that Singleton was at grave risk of attack. Indeed, a Henrico County Jail Deputy actually confirmed this knowledge in a statement to one of Singleton's relatives.

35. There were multiple factors supporting the contention that Ellis was a known risk, starting with the nature of the charges upon which he was being detained.

36. Specifically, Ellis was being held pending trial for aggravated malicious wounding (VA Code §18.2-52.1); malicious wounding by mob (VA Code §18.2-41); attempted aggravated sexual battery (VA Code §18.2-67.3); and attempted forcible sodomy (VA. Code §18.2-67.1).

37. The aforementioned charges stemmed from a multiple day abduction where Ellis was alleged to have beaten and tortured the victim.

38. Ellis provided a video recorded interview, facilitated by Henrico County Jail personnel, to WTVR news concerning his pending charges prior to the incident forming the basis of this complaint.

39. Presumably, such an interview would not have occurred without the assistance and approval of high-ranking jail employees and the knowledge and approval of Defendant Wade.

40. Additionally, on August 15, 2019, just days before the Singleton attack, Ellis and another inmate assaulted inmate J. Sheldon in Day Room 228, Cell #1.

41.     As a result, Ellis was charged with a Level 1 assault and the victim was relocated for his personal safety. Upon information and belief, keep separate notifications were placed in the system.

42.     An incident detail report was generated as a result of this assault and Defendant Sgt. Jarrell Cooke took photos of inmate Sheldon's injuries. Not only did Cooke have knowledge of this incident, but Defendants Tadros and Bundick had knowledge as well. In interviews after Singleton's assault, Tadros and Bundick both admitted that they knew of Ellis' recent attack on another inmate.

43.     Similarly, in investigative interviews following the Singleton assault, Lt. Bundick confirmed his knowledge of previous institutional charge against Ellis and indicated that those charges gave rise to a hearing in which the Prison Rape Elimination Act was discussed. Based in part on this knowledge, Lt. Bundick termed Ellis "a dangerous person."

44.     Despite the aforementioned, and the institutional charges triggering PREA, Ellis was returned to Day Room 228 and re-assigned to Cell #2 with Singleton and inmate Goode sometime between August 20 and August 24.

45.     In addition to these prior incidents, Ellis himself made clear his desire to commit violence upon others. Upon information and belief, Ellis specifically manifested his intent and/or desire to assault, maim, or kill someone during his period of incarceration to other inmates and deputies in an effort to receive an enhanced sentence on the charges for which he was being detained.

46.     On August 25, 2019, Deputy Will Holley was on duty serving his post in booking at approximately 3:10 a.m., when Deputy Defendant Sanders escorted Ellis to holding immediately following the assault on Singleton.

47. Upon asking inmate Ellis his name, Deputy Holley stated that Ellis responded "Satan." Other inmates began calling out to Ellis asking what happened, to which Ellis responded "we stomped his ass...." Ellis then stated "I'm trying to catch a murder charge before my 23rd birthday." Although this particular pronouncement was made <u>after</u> the assault on Singleton, it corroborates facts already known to Defendants, specifically, that Ellis was a dangerous person who intended to harm other inmates with little to no provocation. Ellis continued to relay similar sentiments to every deputy. "I wish I had killed him." "I wanted the death penalty."

48. Further evidence that the Defendants knew of Ellis' tendencies comes from the Henrico Jail Staff itself. In the days immediately following Singleton's assault, a family member of Isiah Singleton, herein identified as C. Singleton, spoke to a Henrico County Jail Deputy in person. This currently unidentified deputy was familiar with Singleton and Ellis and advised C. Singleton that they (referencing Jail personnel) knew Singleton was being placed in a cell with someone who would assault and/or rape Singleton. Further, they knew that this harm would come to Singleton because Singleton was being held on charges alleging that he assaulted (strangled) his pregnant girlfriend.

49. Inmate Rodney Goode, the second assailant, also had a history of institutional violations known to Defendants, each involving the assault of other inmates while housed at the Jail.

50. Goode was charged for separate assaults from incidents occurring on April, 2, 2019, June 3, 2019, and June 7, 2019, each of which was met with punishment, including in one case, 11 days in isolation. Each of these assaults occurred while Goode was housed in Day Room 228, Cell #2. In each case, instead of moving Goode to a different location, Goode was returned to the exact same place where he had committed these assaults.

51.     Upon information and belief, Lieutenant Goetchuis served as investigator to jail incidents and assaults, just as he did in the subject assault.

52.     In that role, Defendant Goetchuis would be aware of inmate Ellis' and inmate Goode's inmate assault records.

53.     Lt. Goetchuis was certainly aware of Goode's assault history. He said as much in an internal communication wherein he indicated his desire to interview inmate Goode first regarding the Singleton assault because of his familiarity with Goode.

54.     Further, in an August 25, 2019 email to Sheriff Command Staff, Lt. Goetchuis stated in part, "inmate Goode is a very assaultive inmate and has recently assaulted two inmates here at Jail West. He was criminally charged with those assaults."

55.     Sgt. Jarrell Cooke, Defendant, was also specifically aware of Goode's assaultive history in Day Room 228, prior to Ellis' and Goode's assault on Singleton, and is documented as having investigated at least one of Goode's institutional violations from Day Room 228.

56.     On their own, inmates Ellis or Goode posed a serious risk of harm to Singleton. Together, housed in a three (3) man cell and left unmonitored for hours on end, they posed an especially potent risk.

c.     **Defendants' Knowledge of Significant Risk of Serious Harm on the Evening of August 24, 2019 and Morning of August 25, 2019.**

57.     Even if the Defendants had no knowledge of the extreme risk of assault to which Singleton was exposed, which Plaintiff alleges they did, Lt. Bundick, Sgt. Cook and the Deputy Defendants working third platoon nonetheless had knowledge that a significant and violent disturbance was occurring on the evening of August 24, 2019 and into the morning of August 25, 2019.

58.     Under the American Correctional Association protocols, which the Henrico County Jail is required to follow to maintain its accreditation with the Association, guards must perform security checks every 30 minutes. The log for August 24-25 indicates that security checks were performed at 19:36, 20:06, 20:36, 21:06, 21:36, 22:06, 22:36, 23:06, 23:36, 00:06, 00:36, 01:06, 01:36, 02:06, 02:36, 03:06, 03:36, 04:06, 04:36, 05:06, etc. The deputies and/or sheriff's personnel who signed off as either performing, verifying, or assisting in these tasks were Deputy Sanders, Deputy Tadros, Deputy Holley, Sgt. Cooke, and Lt. Bundick.

59.     Upon information and belief, the aforementioned Deputies, Sergeants, and Lieutenant identified on the Third Platoon log rotated duties for cell checks.

60.     Lieutenant Bundick, as well as every Deputy under his supervision on third platoon shift, independently and individually, knew that the requisite cell checks were not being performed on the night in question, as well as for months leading up to the night of the assault.

61.     Equally, they each knew that logs/documentation asserting that the checks had been performed had been falsely documented and they each had an active role in such falsification.

62.     Further, Deputy Sanders was identified by one of the inmate witnesses as the deputy who peered through the gate at some point during the assault but failed to enter the dayroom.

63.     If these officers had performed these checks as purported, the attack against Singleton would not have occurred, or at the very least, he might have been spared the grievous pain and injuries he suffered.

64.     This is evidenced most plainly by video surveillance, both inside Day Room 228 itself as well as outside, capturing the exterior door and the hallway to the sallyport.

65.     The interior camera to Day Room 228, upon information and belief, focuses on the interior cell doors as well as the main entrance door to the day room.

66.     After lockdown at 11:30 p.m. (23:30) August 24, no one is seen entering the dayroom until Deputy Tadros enters at 3:04 a.m. on August 25.

67.     The exterior camera capturing Day Rooms 227 and 228, as well as the hallway towards the sallyports, show deputies and an occasional inmate walking by during the hours-long beating, but no deputy ever entered the day room to investigate or perform an actual security check.

68.     Lest the video surveillance is doubted, statements from the inmates and the deputies themselves make clear that actual security checks are routinely skipped, despite written certification that they were being conducted.

69.     Of the three inmate witnesses referenced previously herein, two of them stated, without prompting, that deputies routinely did not come into the pod to perform security checks after lockdown.

70.     Ellis himself took the time to independently repeat the statement he made to Deputy Tadros when he was first discovered just after 3:00 a.m. to Lt. Bundick and Sgt. Cooke. Specifically, "I'll bet y'all will start coming in doing your (security) checks now."

71.     Defendant Cooke also conceded that deputies do not always go into the day room.

72.     Cooke further stated that if the inmates are on lockdown and they are banging, the deputies can hear them, apparently referencing past incidents where deputies have heard commotion emanating from within the day rooms while standing outside.

73.     The failure to perform routine security checks is even more shocking given that Deputies must have heard significant disturbances arising from the assault on Singleton.

14

74. To the letter, every inmate described Singleton's screams for help, as well as his banging and kicking as extremely loud. They also described the assault itself as loud and disturbing.

75. That Deputies must have heard the sounds emanating from Day Room #228 is not simply conjecture, but is instead proven by the investigation into the matter.

76. Forensic investigators met with Lt. R. Goetschuis on several occasions throughout the course of Ellis' and Goode's criminal investigation. On one such occasion, an experiment was conducted where the lead criminal detective asked the forensic investigator to step into Cell #2 of Day Room 228 where Singleton had been housed, to kick on the door, and yell out the lead detective's name several times. The lead detective took post in the hallway of the sallyport. It was noted that while the detective could not discern what was being said, he/she could hear the yelling and clearly heard the multiple strikes on the door.

77. This test was consistent with Defendant Cooke's own statement that if the inmates are banging, the deputies can hear them from outside of the day room.

   **d.**   **The Plaintiff's Recollection:**

78. Isiah Singleton's recollection of the events leading up to the night of August 24-25, 2019 was severely affected by the injuries he sustained. A clearer picture developed from his perspective as his recovery progressed.

79. Of the two cellmates, Singleton asserted that the older of the two, believed to be Rodney Goode, was housed in Singleton's cell for approximately two weeks before primary assailant Ellis, was assigned to his cell.

80. During the two weeks before Ellis was assigned, Singleton endured moderate harassment from Goode, but nothing that rose to the level of concern to justify notification or complaint to the Defendants.

81.     When Ellis was assigned to Day Room 228, Cell #2, however, Goode's harassment increased. To Singleton, it appeared that Goode's behavior and treatment of him was influenced by Ellis and they would feed off of each other to harass and intimidate Singleton.

82.     On August 24, 2019, sometime shortly after lockdown when the occupants of the Day Room were locked in their individual cells, Goode and Ellis confronted him and accused him of touching himself. They told him that he had better "check out." (a term used by inmates when they want to notify the guards to allow them to switch cells).

83.     Ellis then said, something to the effect of "so you want me to fuck you or something," and laid down beside Singleton and said "let me slip this in you."

84.     Singleton resisted the advance and began to kick the door multiple times and yell and scream for the guards to let him check out, but no one came.

85.     Other inmates began yelling and asking what was going on and Singleton responded that he was trying to check out. He recalls inmates telling him that "them boys (referencing the guards) won't going to come around until about 4 or 5:00."

86.     The next thing he recalls is being beaten and kicked. He continued to yell for as long as he had the ability to do so, but no one came.

87.     Upon information and belief, several occupants of Day Room 228 who heard the prolonged beating also called out for assistance throughout the night, but no one came.

88.     As a result of the prolonged beating, Mr. Singleton was knocked unconscious and left in a heap until he was discovered the next morning by a defendant deputy.

89.     Singleton was so severely beaten that he was placed into a medically induced coma for a week having suffered a fractured skull, facial fractures, a broken jaw, broken and dislocated arm(s) and muscle tears, cracked ribs, and excessive loss of blood, among other serious permanent and disabling injuries.

90. The incident garnered a great deal of press coverage at the time, whereupon Defendant Wade described the beating as the "worst incident he had ever seen," in his time as Sheriff.

91. Upon information and belief, assailant John Ellis was being detained for aggravated malicious wounding, malicious wounding by mob, abduction, attempted aggravated sexual battery and attempted forcible object sexual penetration, at the time he attacked Singleton.

92. Defendants knew of Ellis' violent history, institutional violations, the sexually assaultive nature of his pending charges and prior institutional violation just days before, and his expressed desire to hurt someone and/or to commit institutional violations in order to receive enhanced punishment when they placed Ellis in Singleton's cell.

93. Defendants knew or, at a minimum, were aware that circumstances existed which posed a substantial risk that Singleton would be assaulted by Ellis if they were housed together.

94. Moreover, if it is confirmed that deputies intentionally told Ellis of the facts surrounding Singleton's charges thereby increasing the likelihood that Ellis would assault Singleton, the Defendant deputy's actions were clearly intentional.

95. Despite knowledge of the risks Ellis posed to Singleton, Defendants' each of them, allowed Ellis to be housed with Singleton.

96. Not only did the defendants ignore this risk by failing to act in a manner to prevent its occurrence, they failed to respond to the assault within a reasonable time frame to prevent or mitigate against severe and permanent injury, and they falsely certified that security checks had been performed when they had not.

e. **Understaffing and Overcrowding:**

97. Upon information and belief, at the time of the incident, the Henrico County Jail West Facility was both severely understaffed and overcrowded.

98.     Sheriff Wade had been acutely aware of the understaffing and excessive population issue for years leading up to Plaintiff's maiming, so much so, that he had repeatedly addressed the issue with Henrico County Administration and the Compensation Board.

99.     Upon information and belief, the Compensation Board and County Administration either failed to act, or at a minimum, acted too slowly to address Defendant Wade's repeatedly addressed concerns with staffing and overcrowding.

100.    At the time of the incident, and all times leading up thereto, Henrico County Jail was a certified by the American Correctional Association (ACA). ACA standards dictate that cell checks be performed every thirty (30) minutes.

101.    Sheriff Wade, acutely aware of ACA standards and the unaddressed issue of understaffing, allowed his staff to adopt a culture, custom, habit, or policy of omitting physical cell checks every thirty minutes.

102.    This policy was so pervasive that inmates knew that cell checks were not going to be performed after final head count and lockdown, thereby affording them a window to plan attacks on inmates they wished to assault.

103.    Moreover, the cell checks were not only knowingly missed or avoided, the culture, custom or policy adopted by Sheriff Wade and his employees knowingly permitted the intentional falsification of documents affirming that cell checks had been performed when they clearly had not been.

104.    Singleton was beaten by his two cellmates for several hours, during which time, his calls for help while he was physically able to do so, were not heard or worse, ignored. Additionally, other day room occupants who heard the beating deemed it so severe that they too called for help, but no one came.

105. Defendants did not perform the required cell checks every thirty (30) minutes. This failure was either the result of understaffing, and/or an intentional failure to comply with known ACA standards.

**f.    Difficulty Obtaining Information:**

106. Plaintiff sent FOIA request for specific information pursuant to the Virginia Freedom of Information Act on May 18, 2020, to include but not limited to the names of the deputies and employees responsible for the supervision of Day Room 228, on or about August 24, 2019 through August 26, 2019. The only documents received responsive to this request were Singleton's medical/treatment records within the jail and a cover sheet regarding his initial arrest.

107. Acknowledging that an active criminal investigation was ongoing at the time of the initial request, Plaintiff sent a second FOIA request at the conclusion of the criminal case against inmates Ellis and Goode on October 14, 2020. Despite the conclusion of the investigation and provisions within the statute permitting the discretionary disclosure of the requested information, (See VA Code § 2.2-3706 applicable before July 2021), the County of Henrico declined to disclose the Henrico County Police Department investigative file.

108. Disclosure of this information would have resulted in no prejudice to the criminal investigation because it had concluded, and inmate Ellis and Goode had both been sentenced for their roles in the Singleton's felony assault.

## VI.    DUTY

### A.    Defendants owed various duties to Singleton

109. At all times while Singleton was detained at the Jail, Singleton was in the custody and under the care of Defendant Sheriff Wade and his deputies/employees/agents, including, but not limited to, Defendants Goetschius, Bundick, Tadros, Sanders, Cooke, and John Doe 1-4.

110.    The Defendants owed duties to Singleton.  Among these duties, Defendants, each of them, had statutory and common law duties of care to Singleton, including affirmative duties to protect prisoners and pretrial detainees (Singleton) from violence at the hands of other prisoners.

111.    At all relevant times herein, Defendants, each of them, owed duties to Singleton, a pretrial detainee, pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution.

112.    Pursuant to state statute, Defendant Sheriff Wade was responsible for the day-to-day operations at the Jail, and had the duty of care and custody for Singleton while he was detained at the Jail.  Va. Code § 53.1-95.8, incorporating by reference Va. Code §§ 53.1-116 et seq. and 15.2-1609.

113.    Defendants, each of them, had a duty to perform cell checks, or as supervisors to the Deputies assigned to perform them, had a duty to make sure they were performed every thirty minutes per ACA standards.

114.    Defendant Wade and the other supervisory defendants had a duty to prevent the proliferation of an unwritten policy or custom that allowed jail employees to routinely avoid their responsibility to perform cell checks per ACA standards.  Moreover, Defendant Wade had a duty to eliminate such practice once it became known to him, as well as to eliminate the practice of allowing deputies to falsify records asserting that record checks had been performed when they had not.

**B.**    **Defendants breached duties owed to Singleton; Defendants' conduct and omissions violated clearly established statutory and Constitutional rights of which Defendants knew.**

115.    Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to

Singleton, and were negligent, grossly negligent, willfully and wantonly negligent, and deliberately indifferent to Singleton's safety and care.

116. In total disregard of Singleton's safety, Defendant's staff, agents or employees, transferred Ellis to Cell #2 to be housed with Singleton just days after a previous institutional assault of a sexual nature invoking PREA and prompting Lt. Bundick to label Ellis as dangerous. This, despite Ellis being held and awaiting resolution on charges of aggravated malicious wounding, malicious wounding by mob, abduction, attempted object sexual penetration, and attempted aggravated sexual battery.

117. Ellis had also expressed his intention to harm inmates and commit institutional violations in an effort to enhance his sentence on other violent offenses for which he was awaiting sentencing.

118. Additionally, and most disturbing, according to C. Singleton following his discussion with a currently unnamed/unidentified deputy, the placement of Singleton and Ellis together was intentional. Specifically, a deputy or deputies informed inmate Ellis and Goode about the facts surrounding his felony domestic assault charges (strangulation of the expectant mother of Singleton's child) and then placed Ellis in the same day room and lock up with Singleton.

119. Defendants either put Ellis in the same day room and cell with Singleton to intentionally allow harm to come to him after disclosing the specifics regarding his arrest and detention to Ellis, or ignored the risk posed by Ellis (an inmate who expressed his intention to harm others, had a history of institutional violations, at least one sexual in nature, and was being detained for sexually assaultive and deviant behavior), or both.

120.   Defendants were possessed with sufficient information to reasonably infer that harm would come to Singleton and that they were placing him in a dangerous and vulnerable position.

121.   Despite this knowledge, Defendants disregarded the excessive risk of harm to Singleton's health and safety and failed to take measures to protect him.

122.   Additionally, Defendant's staff, deputies, and agents, failure to conduct required cell and welfare checks every thirty minutes in compliance with ACA guidelines, lead to the assault and/or a prolonged assault, by all accounts lasting several hours, and amounted to deliberate indifference to the harm to which Plaintiff had been exposed at the hands of a fellow inmate/pretrial detainee.

123.   Accordingly, certain of Defendant Sheriff Wade's deputies/employees/agents were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent to Singleton's condition. Further, rather than responding immediately to inmate Ellis' and Goode's assault of Singleton, Defendants deliberately disregarded Singleton's safety and need for medical attention by failing to conduct cell and inmate welfare checks every thirty minutes, thereby allowing the beating and/or a prolonged beating and/or worsening conditions and permanent physical injury. Whether the failure to comply with ACA guidelines was the result of understaffing and/or simply the result of dereliction of assigned duties/tasks, it was a conscious decision amounting to the deliberate indifference of the safety of inmates and pre-trial detainees, more specifically the Plaintiff.

124.   Indeed, the joint and several conduct of each of the Defendants, and/or of their agents and/or employees, alone or in combination, as aforesaid, was so wanton or dispatched with such negligence as to evince a conscious disregard for the rights, health, safety and well-being of Singleton.

### a. **Administrative remedies**

125.    Singleton was transported to the hospital upon discovery on the morning following his assault, where he remained until he was released to his family under his personal recognizance.

126.    Singleton was cared for by his family for months following his release and the underlying charges leading to his arrest and detention were nolle prossed.

127.    Accordingly, Singleton was never in a position to file grievances or exhaust administrative remedies within the Jail.

## VII.    COUNTS

### COUNT I

### State Law Claims

### GROSS NEGLIGENCE

128.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

129.    Defendants collectively had, among other duties, duties to exercise reasonable care with regard to Singleton, however, the foregoing Defendants breached those duties.

130.    Defendants collectively owed duties to Singleton to treat him in accordance with recognized and acceptable standards regarding the treatment of an inmate, specifically to protect inmates from harm from other prisoners; however, the Defendants breached the standard of care.

131.    The foregoing Defendants, each of them, were grossly negligent in that their actions and inactions described throughout this Complaint, showed such a level of indifference to Singleton so as to constitute a complete lack of care and utter disregard or prudence for

Singleton's safety. Additionally, the several acts of negligence, when combined, had the cumulative effect of showing a reckless or total disregard for Singleton.

132. As a direct and proximate result of the gross negligence of the Defendants, Singleton was severely and permanently injured as described herein.

133. As a direct and proximate cause of the gross negligence of the Defendants, which contributed to and was the proximate cause of Singleton's injuries, Singleton sustained damages, including but not limited to:

    a. Bodily Injury,

    b. Pain, suffering, inconvenience, and mental anguish,

    c. Permanent physical injury, and

    d. Medical expenses, past, present and future.

134. The Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT II

## WILLFUL AND WANTON NEGLIGENCE

135. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136. Defendants, had, among other duties, duties to exercise reasonable care with regard to Singleton; however, the Defendants, individually and collectively, breached these duties.

137. The Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard of Singleton's rights. In addition, the Foregoing Defendants acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to

Singleton when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct and/or inaction would result in injury to Singleton.

138.     As a direct and proximate cause of the willful and wanton negligence of the Defendants, which contributed to and was the proximate cause of the injuries herein complained of, Singleton suffered great physical pain, permanent injury, medical expenses, and mental anguish.

139.     The Defendants' willful and wanton negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

140.     Also, the foregoing willful and wanton negligence claim supports, and the Plaintiff seeks, the imposition of significant punitive damages.

## COUNT III

## DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
## (FAILURE TO PROTECT PRISONER FROM ASSAULT)

141.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

142.     At all times relevant to the allegations in this Complaint, Defendants Wade, Goetcheus, Bundick, Sanders, Tadros, Cooke, and John Doe 1 through 4 (collectively referred to *in this Count* as the "Foregoing Defendants") acted or failed to act under color of state law.

143.     The Eighth and Fourteenth Amendments to the U.S. Constitution impose a duty on prison/jail officials to protect prisoners from violence at the hands of other prisoners.

144.     As described in this Complaint, the Foregoing Defendants failed to protect Singleton from assault/harm despite actual and constructive knowledge that he was exposed to harm at the hands of pre-trial detainees Ellis and Goode alleged herein.

25

145.     The Foregoing Defendants ignored this known risk of harm to the Plaintiff with deliberate indifference to Singleton's health and safety, thereby placing Singleton in substantial risk of serious harm.

146.     The Foregoing Defendants and/or their staff, employees, or agents knew that there was a substantial risk that Singleton would be harmed based on Ellis' institutional history, his criminal record, and specific manifestations of intentions to harm inmates in an effort to obtain a bevy of institutional charges in order to enhance his punishment.   Moreover, Ellis had just recently received assault charges of a sexual nature within days of his assault on Singleton prompting PREA discussions and having him labeled as dangerous by Lt. Bundick.  Despite such knowledge, the Foregoing Defendants failed to reasonably respond to the threat Ellis posed.

147.     The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

148.     As a direct and proximate result of the Foregoing Defendants' conduct, Singleton suffered serious physical and permanent injuries at the hands of inmates Ellis and Goode. Singleton was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution and protected under 42 U.S.C. §1983.

149.     The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Singleton's rights, by reason of which Plaintiff is entitled to recover punitive damages.

150.     The Foregoing Defendants' violations of the Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs.

## COUNT IV

## SUPERVISORY LIABILITY

## THE HENRICO SHERIFF'S OFFICE POLICY OR CUSTOM OF OMITTING CELL CHECKS CONTRARY TO ACA STANDARDS, COMBINED WITH THE KNOWN FALSIFICATION OF SECURITY LOGS LED TO THE VIOLATION OF SINGLETON'S CONSTITUTIONAL RIGHTS

### (Wade, Goetschius, and Bundick)

151.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

152.    Defendants Wade, Geotschius, and Bundick were each supervisors in their official capacity to varying degrees as alleged herein, responsible for the operation of the Henrico County Jail.

153.    Each defendant knew and allowed for their deputy employees to persist in behavior so consistent and pervasive such to be perceived as official policy or custom, to wit the failure to require deputies to perform mandatory cell checks every half hour per ACA standards for months preceding the incident assault.

154.    Further, each defendant knew that deputies under their supervision not only failed to perform the requisite cell checks, but that each of them, to include Defendant Wade, Goetschuis and Bundick, allowed jail records to be falsified to affirm that cell checks had been performed when they had not.

155.    That the unofficial policy and custom of omitted cell checks and record falsification created an opportunity, known to inmates throughout the jail, to attack and assault inmates, to include the Plaintiff, without interference or interruption.

156.    That the existence of the aforementioned policy and custom, combined with the supervisors' individual and official failure to take remedial action to eliminate such behavior

once known, caused the jail employees who adopted the custom to violate Singleton's constitutional rights and amounted to deliberate indifference on the part of each supervisory defendant.

157. The Foregoing Defendants' violations of the Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs.

## VIII.  JURY TRIAL DEMANDED

Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of the Defendants, specifically, Defendants Wade (Sheriff, Henrico County, during August 2019), and the named defendant Lieutenants, Sergeants and Deputies, jointly and severally, in the amount of Five Million Dollars ($5,000,000.00), or in such greater amount to be determined by trial, costs, pre-judgment and post-judgment interest, attorneys' fees (in connection with the federal civil rights claims), punitive damages in the amount of One Million ($1,000,000.00) and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
ISIAH L. SINGLETON

_____/s/_____
Thomas L. Johnson, Jr., VSB# 38814
johnson@bajinjurylaw.com
Christopher L. Anderson, VSB# 35173
anderson@bajinjurylaw.com

Bricker Anderson & Johnson, PC
411 East Franklin Street, Suite 504
Richmond, VA 23219
(804) 649-2304
(804) 649-3380 Fax
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of November, 2021, the foregoing was electronically

filed using the CM/ECF filing system with the Clerk of the Court, and that Notice of Electronic

Filing was thereby sent to the following counsel of record:

William W. Tunner (VSB# 38358)
Rachel W. Adams (VSB# 92605)
*Thompson, McMullan PC*
100 Shockoe Slip, 3rd Floor
Richmond, VA 23219-4140
(804) 698-6205
(804) 780-1813 (facsimile)
wtunner@t-mlaw.com
radams@t-mlaw.com
Counsel for Rodney Bundick, Jarrell Cooke,
Fares Tadros, and Kaiyell Sanders

William F. Etherington (VSB# 14152)
Thomas N. Jamerson (VSB# 75035)
Greer Q. Drummand (VSB# 93479)
808 Moorefield Park Drive, Suite 110
North Chesterfield, VA 23236
(804) 788-1500
(804) 788-0135 (facsimile)
wetherington@bealelaw.com
tjamerson@bealelaw.com
gdrummand@bealelaw.com
Counsel for Michael L. Wade and
R.G. Goetschius

By: _____ /s/ _____
Thomas L. Johnson, Jr., VSB# 38814
johnson@bajinjurylaw.com
Christopher L. Anderson, VSB# 35173
anderson@bajinjurylaw.com
Bricker Anderson & Johnson, PC
411 East Franklin Street, Suite 504
Richmond, VA 23219
(804) 649-2304
(804) 649-3380 Fax
*Counsel for Plaintiff*