IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ISIAH SINGLETON,
        Plaintiff,

v.

                                  Civil Action No. 3:21cv553

MICHAEL L. WADE, et al.,
        Defendants.

### OPINION

As the night of August 24 turned into the morning of August 25, 2019, two inmates violently assaulted Plaintiff Isiah L. Singleton in Cell 2 of Dayroom 228 in the Henrico County Jail West (the "Jail"). The hours-long assault left Singleton with "a fractured skull, multiple facial fractures, a broken jaw, . . . broken and dislocated arm(s), cracked ribs, and excessive blood loss." (ECF No. 42, at 3.) Two years later, Singleton brought this action against various Jail personnel,[1] asserting state and federal claims, for their failure to prevent or intervene in the attack. Specifically, Singleton asserts claims for gross negligence (Count One), willful and wanton negligence (Count Two), and violations of his Eighth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 (Count Three), against all of the defendants in their individual capacities. He also asserts a claim for supervisory liability pursuant to § 1983 against Defendants Wade, Goetschius, and Bundick (Count Four), in both their individual and official capacities. All of the defendants have moved to dismiss some or all of Singleton's claims against them. (ECF Nos. 43, 45, 47, 48.)

---

[1] Singleton sues former Henrico County Sheriff Michael L. Wade, Lieutenant R. G. Goetschius, as well as Sergeant Jarrell Cooke, Lieutenant Rodney Bundick, Deputy Fares Tadros, and Deputy Kaiyell Sanders (hereinafter the "on-duty defendants"). Singleton also sues four unnamed John Does.

In their motions, the defendants raise nearly identical arguments for relief. Accordingly, the Court considers their motions together. All of the defendants ask the Court to dismiss Singleton's amended complaint because:

> Singleton's "state law claims for gross negligence and willful and wanton negligence relating to the conditions of his confinement . . . are barred by Virginia's one-year statute of limitations under Va. Code § 8.01-243.2." (ECF No. 44, at 2; ECF No. 46, at 1–2; *see also* ECF No. 49, at 2; ECF No. 50, at 2.)

Further, all of the defendants, *except* Defendant Sanders, ask the Court to dismiss Singleton's amended complaint because:

> Singleton "does not plead facts to support the elements of each of his claims for gross negligence, willful and wanton negligence, and violation of his constitutional rights under the Eighth [and Fourteenth] Amendment[s]." (ECF No. 44, at 2; ECF No. 46, at 2; *see also* ECF No. 49, at 2; ECF No. 50, at 2.)

> They are "entitled to . . . qualified immunity." (ECF No. 44, at 2; *see also* ECF No. 46, at 2; ECF No. 49, at 18; ECF No. 50, at 2.)

Finally, Defendants Wade, Goetchius, and Bundick move to dismiss Singleton's official capacity supervisory liability claim because he "fails to allege facts to support a claim . . . against" them. (ECF No. 44, at 2; *see also* ECF No. 49, at 2.)

For the reasons set forth below, the Court will dismiss Singleton's Eighth Amendment claims and will otherwise deny Defendants Sanders, Tadros, and Cooke's motions in full. Further, the Court will grant Defendants Bundick, Goetchius, and Wade's motions in part[2] and deny them in part.

---

[2] In his response to Defendants Wade and Goetchius's motion to dismiss, Singleton withdraws his claims for willful and wanton negligence and official capacity supervisory liability against them. (ECF No. 55, at 10, 12.) Similarly, Singleton withdraws his official capacity claim against Bundick. (ECF No. 57, at 14.) Accordingly, the Court will grant the defendants' motions as to those claims.

## I. **FACTS ALLEGED IN THE AMENDED COMPLAINT**[3]

Following his arrest for allegedly assaulting his pregnant girlfriend, (*id.* at 11), Singleton awaited trial at the Jail, (*id.* at 2, 5). Jail personnel assigned Singleton to Cell 2 in Dayroom 228.[4] (*Id.* at 5.) Dayroom 228 "consists of an open gathering space for inmates and pre-trial detainees to congregate during the day with the liberty to go in and out of their individual cells until designated lockdown at night." (*Id.*) "The individual cells line [Dayroom 228] on two levels, a main level and a balcony, and house as many as three . . . inmates per cell." (*Id.*)

Singleton was not the only detainee assigned to Cell 2. Sometime between April 2, 2019, and August 24, 2019, jail personnel assigned Rodney A. Goode ("Goode") to the cell. (*Id.* at 5, 11.) Between April 2 and August 24, Goode committed three separate assaults on other Jail inmates. (*Id.* at 11.) "In each case, instead of moving Goode to a different location," Jail personnel returned Goode to Cell 2 and assigned him a new cellmate. (*Id.*) Because Defendant Goetchius investigated "jail incidents and assaults," he knew that Goode had previously assaulted other

---

[3] The events giving rise to this action took place on August 24 and 25, 2019. (ECF No. 42, at 5–9.) At all relevant times:

Defendant Wade "served as the Sheriff of Henrico County" and "operated, directed, and supervised the Jail and its deputies, agents and employees." (*Id.* at 4.) Singleton asserts that "Wade was responsible for implementing customs, policies and procedures" at the Jail. (*Id.*)

Defendant Goetschius "served as a Lieutenant in the Henrico Sheriff's Department" and "acted as a supervisor at the . . . Jail." (*Id.*)

Defendant Bundick "served as a Lieutenant in the Henrico Sheriff's Department, served as watch commander to third platoon (night shift), and acted as the supervisor at the . . . Jail." (*Id.*)

Defendant Cooke "served as a Sergeant in the Henrico Sheriff's Department and acted as a supervisor at the . . . Jail." (*Id.*)

Defendants Tadros and Sanders "served as [Deputies] at the . . . Jail and worked third platoon (night shift)." (*Id.* at 5.)

[4] Singleton does not identify the person who assigned him to Cell 2 but asserts that the County of Henrico has declined to "disclose the Henrico County Police Department investigative file" on his case or provide other information including "the names of the deputies and employees responsible for the supervision of Day[r]oom 228." (*Id.* at 19.)

inmates in Dayroom 228.[5]  (*Id.*)  Defendant Cooke also investigated at least one of Goode's "institutional violations."  (*Id.*)

Goode and Singleton shared Cell 2 "for approximately two weeks" before Jail personnel assigned a third detainee, John Lawrence Ellis ("Ellis"), to the cell.  (*Id.* at 15.)  "During the two weeks before Ellis was assigned, Singleton endured moderate harassment from Goode."  (*Id.*)  After Jail personnel assigned Ellis to the cell,[6] however, Goode's harassment of Singleton increased.  (*Id.* at 16.)

Like Goode, Ellis had a "violent history,"[7] and multiple "institutional violations" including an August 15, 2019, assault on a detainee in Cell 1 of Dayroom 228. (*Id.* at 9–10, 17.)  The August 15 assault led to a Level 1 assault charge.  (*Id.* at 10.)  In an investigative interview following Singleton's attack, Defendant "Bundick confirmed his knowledge of [the] previous institutional charge against Ellis" and a related hearing during "which the Prison Rape Elimination Act was discussed."  (*Id.*)  "Based in part on this knowledge, . . . Bundick termed Ellis 'a dangerous person.'"  (*Id.*)  Defendants Cooke and Tadros also knew about the August 15 attack; Cooke photographed the victim's injuries.  (*Id.*)  Singleton asserts that Defendant Goetchius also knew of

---

[5] In an email he sent on August 25, 2019, Defendant Goetchius described Goode as "a very assaultive inmate [who had] recently assaulted two inmates . . . at Jail West." (*Id.* at 12.)  Despite this knowledge, supervisors at the Jail made no effort to meaningfully isolate Goode from the general population prior to his attack on Singleton.

[6] As a result of the assault, Singleton suffers from memory loss, (*id.* at 15), but he contends that Jail personnel assigned Ellis to Cell 2 sometime between August 20 and August 24, 2019, (*id.* at 10).

[7] Ellis was awaiting trial for aggravated malicious wounding, malicious wounding by mob, attempted aggravated sexual battery, and attempted forcible sodomy "stemm[ing] from a multiple day abduction where Ellis [allegedly] . . .beat[] and tortured the victim." (*Id.* at 9.)  Both inmates attacked Singleton, but Singleton identifies Ellis as the "primary assailant." (*Id.* at 15.)  During his detainment, jail personnel facilitated an interview between Ellis and a local news station in which Ellis discussed his pending charges. Singleton contends that "high-ranking jail employees," including Defendant Wade, knew about and approved of the interview. (*Id.* at 9.)

the August 15 assault pursuant to his role as "investigator to jail incidents and assaults." (*Id.* at 12.) Further, Ellis openly "expressed [a] desire to hurt someone . . . or . . . commit institutional violations in order to receive enhanced punishment" prior to being assigned to Singleton's cell. (*Id.* at 17; *see also id.* at 10.) Accordingly, Ellis had earned the moniker "Satan" among the inmate population. (*Id.* at 7, 11.)

## *A. The Assault*

At 11:30 p.m. on August 24, 2019, Defendant Bundick assigned Defendants Tadros and Sanders to "perform headcount and lockdown duties" for Dayroom 228. (*Id.* at 6.) "Pursuant to American Correctional Association (ACA) standards," Jail personnel must "perform physical cell security checks every thirty . . . minutes." (*Id.*) Accordingly, at least one of the on-duty employees, including Tadros, Sanders, Cooke, and Bundick, were required to perform a cell check each half hour following the lockdown and then attest in a security log as "either performing, verifying, or assisting" in the check. (*Id.* at 13.) Singleton asserts that the defendants rotated these duties.

Several minutes after lockdown on August 24, 2019, Singleton began to "mule kick" the door of Cell 2 and yell for assistance. (*Id.* at 6.) He repeatedly screamed "for deputies to open the door because he was being assaulted." (*Id.*) Over the next three and a half hours, Ellis and Goode violently attacked Singleton, stopping only for brief periods. (*Id.*) Other inmates housed in cells in Dayroom 228 described the event as "loud and disturbing." (*Id.*) During the assault, those inmates heard Singleton repeatedly kick or pound on the door to Cell 2 and yell for help. Further, they heard a "heavy storage bin or top hit the floor multiple times." (*Id.* at 7.) Witness testimony and video surveillance show that no Jail personnel entered Dayroom 228 from 11:30 p.m. on

August 24, 2019, until 3:04 a.m. the following morning,[8] however, various Jail staff—including Sanders, Tadros, Bundick, and Cooke—signed off as either completing checks during that time or verifying that such checks occurred.[9]  (ECF No. 42, at 13–14.)

When Defendant Tadros finally entered Dayroom 228 on the morning of August 25, he discovered a piece of paper obscuring the window of Cell 2.  (*Id.* at 8, 14.)  In response, Tadros "radioed control" to open the door.  (*Id.* at 8.)  When the door was opened, "Tadros observed a cell in disarray, with blood all over the walls and floor."  (*Id.*)  "Inmate Goode [sat] on the top bunk, [and] Ellis [stood] in the middle of the floor covered in blood."  (*Id.*)  As Tadros entered, "Ellis walked [past him] with his hands up and said 'I bet y'all will start coming in and doing your cell checks now.'"[10]  (*Id.* at 8.)  Tadros then noticed Singleton in a bloody heap on the bottom bunk of the bed and called for medical attention and back up.  (*Id.*)  Defendants Cooke and Bundick responded shortly thereafter.  (*Id.* at 9.)  In the end, Ellis and Goode beat Singleton so severely "that he had to be placed into a medically induced coma for a week" and "suffered a fractured skull, multiple facial fractures, a broken jaw, brutally broken and dislocated arms, cracked ribs, and excessive blood loss."  (*Id.* at 3.)  Defendant Wade termed it "the worst beating he had ever seen."  (*Id.*)

---

[8] As most relevant, the on-duty defendants signed off that security checks were performed at 12:06, 12:36, 1:06, 1:36, 2:06, 2:36, and 3:06.  (*Id.* at 13.)

[9] Singleton does not identify Defendant Cooke as a member of the third shift platoon and his complaint does not specifically allege that Cooke signed off as having performed or approved a cell check during the time of Singleton's attack, as opposed to before the attack began.  In his response to Cooke's motion to dismiss, however, Singleton confirms that "Cooke was one of several deputies who signed off as either having performed cell checks on the night of the assault or verified that another deputy performed the checks."  (ECF No. 59, at 8.)  Further, based on Cooke's presence at the Jail during the relevant time and the fact that he responded with Bundick to Cell 2 following the attack, the Court draws the reasonable inference that Cooke participated in rotational supervision duties of Dayroom 228 on the night and morning of Singleton's assault.

[10] Ellis later repeated this statement to Defendants Bundick and Cooke.  (*Id.* at 14.)

Following the attack, forensic investigators met with Defendant Goetschius several times. (*Id.* at 15.)  On at least one occasion the investigators performed an experiment to determine whether jail personnel could have heard such an assault from the halls outside of Dayroom 228. (*Id.*)  The investigators determined that "while the [person in the hall] could not discern what was being said, he [or] she could hear the yelling and . . . the multiple strikes on the door."[11]  (*Id.*)  Notably, although surveillance footage shows that no Jail personnel *entered* Dayroom 228 during the attack, the camera captured "deputies and an occasional inmate walking by," and at least one inmate witness observed Defendant Sanders momentarily peer through the gate to Dayroom 228 before walking away.  (*Id.* at 8, 14.)  Following an investigation, a grand jury indicted Ellis and Goode on January 13, 2020, for their roles in the assault. (*See* ECF No. 57, at 6; *see also* ECF No. 42, at 15 (discussing Ellis's and Goode's criminal investigation).)  "Ellis'[s] prosecution terminated on August 14, 2020[,][12] and Goode's terminated with a guilty plea on August 25, 2020." (ECF No. 57, at 6.)

Singleton asserts that what happened to him could not have come as a surprise to the defendants.[13]  To the contrary, despite the prevalence of violent inmate assaults in Dayroom 228

---

[11] Defendant Cooke also stated, "that if inmates are on lockdown and they are banging, the deputies can hear them."  (*Id.*)

[12] Singleton does not explain how Ellis's case ended; however, Henrico County court records show that Ellis pleaded guilty on March 24, 2020.  (ECF No. 38-1.)  The court sentenced him to a term of forty-years' imprisonment with twenty years suspended on August 14, 2020.  (*See id.*)

[13] Singleton also alleges that

[i]n the days immediately following Singleton's assault, a family member of . . . Singleton, . . . spoke to a Henrico County Jail Deputy in person.  This currently unidentified deputy was familiar with Singleton and Ellis and advised [the relative] that they (referencing Jail personnel) knew Singleton was being placed in a cell with someone who would assault and/or rape Singleton [and that] they knew that this harm would come to Singleton because Singleton was being held on charges

7

during the months leading up to his attack, Singleton asserts that Jail staff "routinely" failed to perform cell checks "as a course of habit, custom, or policy for months leading up to the incident," and that the defendants "employed a practice of signing off on 'cell checks' when they did not occur." (*Id*. at 6.) This assertion finds support in the statements that Ellis made to Jail personnel following the attack, (*see id*. at 14), the statements of several inmate-witnesses to the assault, (*id*. at 7, 14), and in Defendant Cooke's similar concession following the incident, (*id*. at 14 ("Defendant Cooke also conceded that deputies do not always go into the dayroom.")). Finally, Singleton asserts that Sheriff Wade knew of problems with understaffing and overcrowding at the Jail and had "repeatedly addressed th[ose] issue[s] with Henrico County Administration." (*Id*. at 18.) Nevertheless, Wade knowingly "allowed his staff to adopt a culture, custom, habit, or policy of omitting physical cell checks," and "intentional[ly] falsif[ying] . . . documents affirming that cell checks had been performed." (*Id*.)

## II. **LEGAL STANDARD**

The defendants move to dismiss Singleton's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In considering the motion, a court must accept all allegations in the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards*, 178 F.3d at 244). The principle that a court must accept all allegations as true, however, does not extend to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

alleging that he assaulted (strangled) his pregnant girlfriend.

(ECF No. 42, at 11.)

8

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a facially plausible claim for relief. *Id.* at 663. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "'[D]etailed factual allegations' are not required," but the well-pleaded facts must permit the court to infer "more than the mere possibility of misconduct." *Id.* at 663, 679 (quoting *Twombly,* 550 U.S. at 555; Fed. R. Civ. Pro. 8(a)(2)). Further, because the defendants' Rule 12(b)(6) motion tests "the sufficiency of a civil rights complaint," the court "must be especially solicitous of the wrongs alleged.'" *Edwards*, 178 F.3d at 244 (quoting *Harrison v. U.S. Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir. 1988).

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem,* 85 F.3d 178, 181 (4th Cir. 1996). "Qualified immunity is such an affirmative defense." *Reid v. Newton*, No. 3:13cv572, 2014 WL 1493569, at *4 (E.D. Va. Apr. 14, 2014) (citing *Behrens v. Pelletier,* 516 U.S. 299, 306 (1996)). Further, "[a] court may dismiss a complaint on statute of limitations grounds 'if the time bar is apparent on the face of the complaint.'" *Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 658 (4th Cir. 2018) (quoting *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005)).

### III. DISCUSSION

#### A. State Law Negligence Claims

All of the defendants assert that Virginia's statute of limitations bars Singleton's claims for

gross negligence (Count One) and willful and wanton negligence (Count Two). For the foregoing

reasons, the Court disagrees and will deny all of the defendants' motions as to this argument.[14]

### 1. Statute of Limitations

Under Virginia Code § 8.01-243.2,

> [n]o person confined in a state or local correctional facility shall bring or have
> brought on his behalf any personal action relating to the conditions of his
> confinement until all available administrative remedies are exhausted. Such action
> shall be brought by or on behalf of such person within one year after [his] cause of
> action accrues or within six months after all administrative remedies are exhausted,
> whichever occurs later.

Va. Code Ann. § 8.01-243.2. The parties agree that § 8.01-243.2 governs Singleton's negligence

claims because Singleton was confined in the Jail at the time his cause of action accrued,[15] and his

negligence claims relate to the conditions of his confinement.[16]  *See Bing*, 283 Va. at 385, 722

S.E.2d at 246 ("For the one-year provision in . . . § 8.01–243.2 to apply, the plaintiff must have

---

[14] The statute of limitations argument is the only ground upon which Defendant Sanders moves to dismiss Singleton's claims against him. (*See* ECF No. 50, at 18.)  Accordingly, the Court will deny Sanders's motion in full.

[15] "In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property." Va. Code Ann. § 8.01-230.

[16] The word "confine'" is defined as "the state of being imprisoned or restrained." Black's Law Dictionary 318 (9th ed. 2009). The statute further provides that such confinement must be in a state or local correctional facility. [Va.] Code [Ann.] § 8.01-243.2. The [Jail] is clearly such a facility, and it was there that [Singleton] was clearly confined. H[is] status as a pre-trial detainee is immaterial to this determination.

*Bing v. Haywood*, 283 Va. 381, 387, 722 S.E.2d 244, 247 (2012); *see Lucas v. Woody*, 287 Va. 354, 363, 756 S.E.2d 447, 451 (2014) (holding "that the statute of limitations provision in . . . § 8.01-243.2 applies to all personal actions related to the conditions of an individual's confinement regardless of whether the plaintiff is still incarcerated when such action is filed"); *see also Rucker v. Piedmont Reg'l Jail Auth.*, No. 3:21cv412, 2021 WL 3863346, at *8 (E.D. Va. Aug. 30, 2021) (applying § 8.01-243.2 to an inmate's negligence claims based on the defendant's failure to prevent an attack by a fellow inmate).

been 'confined' at the time the cause of action accrued, and the cause of action must relate to plaintiff's 'conditions of confinement.'" (quoting Va. Code Ann. § 8.01–243.2)).

Because Singleton's negligence claims accrued, at the latest, on August 25, 2019, the defendants argue that the statute of limitations ran on August 25, 2020, one year *before* Singleton filed his initial complaint on August 25, 2021. (ECF No. 44, at 7.) Singleton concedes that § 8.01–243.2 applies to his state law claims; however, he asserts that Va. Code § 8.01-229(K) and "multiple" Virginia Supreme Court emergency orders tolled the one-year statute of limitations. (ECF No. 57, at 5–8.)

*a. Va. Code § 18.2-229(K)*

Virginia Code Section 8.01-229(K) provides:

> *In any personal action for damages, if a criminal prosecution arising out of the same facts is commenced, the time such prosecution is pending shall not be computed as part of the period within which such a civil action may be brought.* For purposes of this subsection, the time during which a prosecution is pending shall be calculated from the date of the issuance of a warrant, summons or capias, the return or filing of an indictment or information, or the defendant's first appearance in any court as an accused in such a prosecution, whichever date occurs first, until the date of the final judgment or order in the trial court, the date of the final disposition of any direct appeal in state court, or the date on which the time for noting an appeal has expired, whichever date occurs last. Thereafter, the civil action may be brought within the remaining period of the statute or within one year, whichever is longer.

Va. Code. § 8.01-229(K) (emphasis added). Singleton's claims rest upon the facts surrounding his assault. Accordingly, he contends that "the criminal prosecutions of Ellis and Goode arise out of the same set of facts as his personal action against" the defendants. (*See, e.g.*, ECF No. 57, at 6.) Because Goode pleaded guilty on August 25, 2020, Singleton asserts that his complaint–filed on August 25, 2021–is timely. (*Id.*) The defendants argue that Singleton's reliance on § 8.01-229(K) is "misplaced" because Ellis and Goode are not parties to this civil action. (ECF Nos. 44, at 8; 46, at 8; 50, at 8; *see also* ECF No. 49, at 6.) The Supreme Court of Virginia has not directly addressed

11

this issue, and thus, the parties rely on contradictory opinions from other courts.

The defendants cite *Scott v. Coleman*, 83 Va. Cir. 78 (Va. Cir. 2011). *Scott* arose out of a June 2007 hit-and-run accident that resulted in the death of a child. The state charged the driver Coleman with a felony, and he pleaded guilty on October 22, 2007. In April 2009, the personal representative of the decedent, Scott, filed a civil action against Coleman.[17] Scott amended her complaint on August 30, 2010, by adding Antonio Brooks as a defendant. Brooks was not involved in the accident, however, and he argued that the statute of limitations barred Scott's claims against him. The circuit court agreed, finding that "[s]ection [8.01-229(K)] permits the tolling of the statute of limitations . . . where there is or was a criminal prosecution against one of the parties arising from the same facts and circumstances as the existing litigation." *Scott*, 83 Va. Cir. at *2. The Court reasoned that "it does not necessarily follow . . . that other co-defendants or prospective co-defendants . . . against whom no criminal charges were ever filed . . . would or should be subject to the tolling of the statutory period of limitations." *Id.* Because "Brooks was in no way involved in . . . the facts and circumstances surrounding the decedent's death," the Court held that § 8.01-229(K) did not apply and that the statute of limitations barred Scott's claims against Brooks. *Id.* at *3.

Singleton relies on *Wright v. Va. Peninsula Regional Jail Authority*, No. 2:19cv189, 2020 WL 1055665 (E.D. Va. Mar. 4, 2020). In *Wright*, a prison guard, Rhim, repeatedly sexually assaulted a Virginia Peninsula Regional Jail ("VPRJ") prisoner,[18] Wright, between April 20, 2017, and June 30, 2017. Rhim was convicted of carnal knowledge of an inmate by an employee, and

---

[17] The applicable statute of limitations for wrongful death is and was two years.

[18] The Virginia Peninsula Regional Jail Authority ("VPRJA") owned and operated the VPRJ.

his time to appeal expired on December 27, 2018.  On April 16, 2019, Wright sued Rhim, and the superintendent of the VPRJA, the chairman of the board of directors of the VPRJA, and the VPRJA itself ("the VPRJA defendants"), asserting state negligence claims and claims pursuant to § 1983. The VPRJA defendants moved to dismiss, arguing, among other things, that the statute of limitations barred Wright's state law claims against them.  Like the defendants here, the VPRJA defendants asserted that § 8.01-229(K) did not apply because (1) they were not involved in the "earlier related criminal prosecution," (2) "the facts necessary to prove the criminal charges against Rhim for sexual assault [were] not the same as those necessary to determine whether [the VPRJA defendents] were negligent in failing to protect [Wright]," and (3) the statute was ambiguous and should be resolved in their favor. *Id.* at *7.  The court considered each argument in turn and found that (1) party uniformity is not required because "the statute has expansive language that directs courts to look to the <u>facts</u> that gave rise to the cases, rather than to the <u>parties</u> involved";[19] (2) "the statute is not limited to cases where the facts needed to prove the claims in a criminal case are the exact same facts needed to prove the claims in the civil case"; and (3) § 8.01-229(K) is unambiguous.[20] *Wright*, 2020 WL 1055665, at *8–10 (emphasis in original).

    Although the *Scott* court concluded that § 8.01-229(K) requires party uniformity, this Court finds that the plain language of the statute concerns factual circumstances and not parties.  As

---

[19] Most importantly, the Scott court's own declaration that the defendant there "was in no way involved in the accident and the facts and circumstances surrounding the decedent's death" arguably distinguishes the case to such a degree that it calls into question its entire applicability, given that the statue directs courts to consider whether the underlying facts gave rise to both suits.

*Id.* at *8 (quoting *Scott*, 83 Va. Cir. at *2).

[20] *See also McEvily v. K-Mart, Corp.*, 73 Va. Cir. 51, 57, 2007 WL 6013007, at *5 (Va. Cir. 2007); *Pinder v. Knorowski*, 660 F. Supp. 2d 726, 734 (E.D. Va. 2009).

Judge Davis noted in *Wright*, "[t]he Virginia legislature could have written the statute in a way that limited its applicability to only those parties who were defendants in an earlier criminal prosecution, but it did not." *Id.* at *8. Further, it does not appear that other courts have found § 8.01-229(K) ambiguous. *Id.* at *10. After considering the applicable cases and the parties' arguments, the Court concludes that § 8.01-229(K) does not require party uniformity.

The Court now turns to whether Singleton's negligence claims against the defendants arise out of the "general underlying facts surrounding the event that led the parties to bring cases in criminal and civil court." *Id.* at *9. Unlike in *Scott*, where the plaintiff sued someone who was not involved in the incident underlying the criminal prosecution, the Court finds that the defendants were each plausibly involved in the facts and circumstances surrounding Singleton's assault. *See Booth v. Higgins*, No. 7:19cr429, 2020 WL 4209061, at *5 (W.D. Va. July 22, 2020). *But see Brown v. Edmonds*, No. 7:12cv267, 2012 WL 2526735, at *2 (W.D. Va. June 29, 2012) (declining to apply § 8.01-229(K) to a civil suit against prison officials following the malicious wounding prosecution of an inmate because the facts needed to prove the criminal charge were different than those required to prove the plaintiff's civil claims).

### i. Bundick, Tadros, Sanders, and Cooke

Singleton's claims against Defendants Bundick, Tadros, Sanders, and Cooke relate directly to their failure to act during the assault. He asserts that all four defendants were responsible for performing cell checks during the time of his assault and that all four signed off as having either performed such checks or ensuring the checks were performed. Singleton further alleges, however, that the defendants did not, in fact, perform those checks, despite their independent knowledge of recent inmate assaults in Dayroom 228 committed by both of the men who brutally attacked Singleton. Singleton also plausibly alleges that had any of the on-duty defendants

14

performed the required checks or ventured near Dayroom 228, he would have overheard the attack as it was taking place.   Finally, he points to evidence that at one point during the assault, Deputy Sanders stood immediately outside of the gate to Dayroom 228 and walked away.   Accordingly, he asserts that their actions were the direct and proximate cause of his injuries and contends that absent their specific failure to conduct cell checks, Ellis and Goode could not have assaulted him for several hours without interruption.

### ii. Wade and Goetchius

Singleton asserts that, as Jail supervisors, Wade and Goetchius knowingly allowed a culture in which Jail personnel routinely skipped cell checks and thereby left detainees and inmates unsupervised for hours at a time.   Further, Singleton asserts that Goetchius, by virtue of his duty to investigate inmate assaults, knew of the prevalence of serious inmate-on-inmate violence in Dayroom 228, including recent assaults committed by both Ellis and Goode, and that Goetchius failed to take any action to ensure that vulnerable inmates like Singleton were meaningfully monitored.   As to Wade, Singleton asserts that "Wade allowed a culture of omitting . . . cell checks to become . . . accepted in his jail" and that "[t]his culture provided Ellis and Goode with an opportunity to plan their assault on Singleton during a time in which they knew they would not be discovered."   (ECF No. 55, at 9; *see* ECF No. 42, at 18.)   Accordingly, the Court concludes that Singleton's negligence claims against Wade and Goetchius also arise out of the same central facts as the criminal prosecutions against Ellis and Goode—namely *how, when, and why* Ellis and Goode assaulted Singleton in Cell 2 for several hours without interruption.

\*                            \*                            \*

At the motion to dismiss stage, the defendants must "show that the facts necessary to determine that [Singleton's] claims are untimely 'clearly appear' on the face of the complaint."

*Wright,* 2020 WL 1055665, at *12 (quoting *Waites v. Wells Fargo Bank, N.A.*, No. 2:15cv353, 2016 WL 659084, at *2 (E.D. Va. Feb. 16, 2016)); *see also Ott*, 909 F.3d at 658. Although later developments in the case may reveal facts supporting the conclusion that some or all of the defendants were not directly involved in the circumstances surrounding the assault, the Court must draw all reasonable inferences in Singleton's favor at this stage of litigation.[21] Accordingly, the Court finds that § 8.01-229(K) applies to Singleton's negligence claims against each of the defendants.[22] Thus, Singleton's complaint was timely, and the Court will deny their motions as to this argument.[23]

## 2. *Failure to State a Claim*

All of the defendants, except Sanders, argue that Singleton's complaint fails to plead a claim for either gross negligence or willful and wanton negligence against them. (ECF Nos. 44,

---

[21] *See Wright*, 2020 WL 1055665, at *10 n.8; *Booth*, 2020 WL 4209061, at *5 ("Should discovery support [the] defendants' position that . . . [§] 8.01-229(K) does not apply to this case, they may file a motion for summary judgment on this issue.").

[22] "Ellis and Goode were indicted on January 13, 2020," and Goode's prosecution terminated by guilty plea on August 25, 2020. (ECF No. 57, at 6.) Pursuant to § 8.01-229(K), Singleton had one year from that date to file his complaint. He filed it exactly one year to the day, on August 25, 2021.

[23] Singleton also argues that several emergency tolling orders apply to his claims. "In response to the COVID-19 pandemic, the Supreme Court of Virginia entered consecutive emergency orders, which tolled applicable statutes of limitation for civil filings for the period of March 16, 2020, until July 19, 2020—a total of 126 days." (ECF No. 44, at 11; *see also Virginia Supreme Court Sixth and Seventh Orders Extending Declaration of Judicial Emergency in Response to Covid-19 Emergency*.) Singleton does not assert that the emergency orders alone render his complaint timely. Rather, he says that they "provide additional grace" to the period tolled by § 8.01-229(K). (ECF No. 57, at 7–8.) Accepting that Singleton's negligence claims accrued on August 25, 2019, *204 days* elapsed between that date and the first Virginia Supreme Court emergency order on March 16, 2020. "Once the tolling period ended on July 19, 2020, [Singleton] had *[161] days* remaining to file his Complaint." (ECF No. 44, at 11 (emphasis added).) Thus, without applying § 8.01-229(K), Singleton's complaint came due on Monday, December 28, 2020. Singleton file his complaint on August 25, 2021. Accordingly, the Court finds that Virginia's tolling orders would not render Singleton's negligence claims timely.

at 12–15; 46, at 11–14; 49, at 12–15; 50, at 11–14.)  Singleton asserts that each defendant breached

his duty "to treat [Singleton] in accordance with recognized and acceptable standards regarding

the treatment of an inmate, specifically to protect inmates from harm from other prisoners."  (ECF

No. 42, at 23.)  As a result, Singleton suffered numerous, life-altering injuries.

Each defendant contends that the complaint fails to allege either that he had actual

knowledge of the risk Ellis and Goode posed to Singleton or that he personally assigned Singleton

to Cell 2.  (*See, e.g.*, ECF No. 44, at 13.)  Accordingly, each asserts that Singleton's negligence

claim against him must fail.  Because the Court finds that Singleton alleges enough facts to support

the plausible inference that the defendants were responsible for the misconduct alleged, *Iqbal*, 556

U.S. at 663, it disagrees and will deny each of their motions as to Singleton's state law claims.

### a. Gross Negligence (Count One)

To demonstrate gross negligence under Virginia law, a plaintiff must show that the

defendant's conduct demonstrates a "want of even scant care and amounts to the absence of slight

diligence."  *City of Lynchburg v. Brown*, 270 Va. 166, 170, 613 S.E.2d 407, 410 (2005) (citing

*Frazier v. City of Norfolk*, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987)).  It is a "degree of

negligence which shows an utter disregard of prudence amounting to complete neglect of the safety

of another."  *Id.* (quoting *Frazier*, 234 Va. at 393, 362 S.E.2d at 691).  In other words, a claim

of gross negligence fails when the defendant exercised *some* degree of care.  Further, this Court

has held that "a claim of gross negligence fails as a matter of law where there is no deliberate

conduct by the defendant."  *Reid v. Newton*, No. 3:13cv572, 2014 WL 1493569, at *7 (E.D. Va.

Apr. 14, 2014) (citing *Brown*, 270 Va. at 170, 613 S.E.2d at 410); *see also Chapman v. City of

Virginia Beach*, 252 Va. 186, 190, 475 S.E.2d 798, 801 (1996) ("Deliberate conduct is important

evidence on the question of gross negligence." (internal quotation omitted)).  But "[t]here is

17

adequate evidence to support a finding of gross negligence when a defendant is aware of a danger, but fails to take any precautions to guard against that danger." *Caramillo v. Correct Care Sols., LLC*, No. 2:19cv362, 2020 WL 4747786, at \*7 (E.D. Va. Feb. 28, 2020) (citing *Volpe v. City of Lexington*, 708 S.E.2d 824, 829 (Va. 2011); *Chapman*, 252 Va. at 190, 475 S.E.2d at 801). Indeed, "'gross negligence does not require a finding that a defendant *knew* of a substantial risk,' '[i]t is enough that the defendant *should* have been aware of that risk.'" *Id.* (emphasis added) (quoting *Hixson v. Hutcheson*, Nos. 5:17cv32; 5:18cv1, 2019 WL 302516, at \*7 (W.D. Va. Jan. 23, 2019)). *But see Reid*, 2014 WL 1493569, at \*7 ("In the case of failure to act, deliberate conduct necessarily implies actual knowledge of facts that create a choice to act or abstain.").

### i. Bundick, Tadros, and Cooke

The Court begins by noting that tort cases often involve complex fact-based inquiries that are best resolved on a properly developed record. Although the defendants ask the Court to fault Singleton for failing to assert unambiguous facts in his complaint—such as what each defendant conclusively did and did not know or could and could not hear—such is not his burden upon a motion to dismiss.[24] *Iqbal*, 556 U.S. at 663 (explaining that a complaint need not contain detailed facts to survive a motion to dismiss). Accepting as true all well-pleaded allegations and drawing all reasonable inferences in favor of Singleton, the Court finds that Singleton's complaint adequately apprises the defendants of the allegations against them and plausibly pleads facts demonstrating "more than the mere possibility of misconduct." *Id.* at 663, 679.

Singleton asserts that Bundick "served as a Lieutenant in the Henrico Sheriff's Department, served as watch commander to third platoon (night shift), and acted as a supervisor at the Henrico

---

[24] Furthermore, the Court credits Singleton's assertion that the Henrico County Police Department has declined to provide him with relevant information pertaining to his case including information regarding Jail personnel. (*Id.* at 19.)

County Jail." (ECF No. 42, at 4.) Bundick was on duty on the night of Singleton's assault, and he assigned his deputies, including Tadros, to "perform headcount and lockdown duties" in Dayroom 228. (*Id.* at 6.) Singleton asserts that Bundick, Cooke, and Tadros each had a duty to perform physical cell security checks every thirty minutes, pursuant to ACA Standards. (ECF No. 42, at 6.) The defendants did not, in fact, perform any cell checks between 11:30 p.m. on August 24, 2019, and 3:04 a.m. on August 25, 2019; however, they falsified the logs to show they had.[25] (*Id.*) Further, Singleton asserts that Jail supervisors, including Cooke and Bundick, "knew that the deputies . . . were not performing cell checks every half hour as mandated by the ACA" and "actively participated in the falsification [of records] . . . by confirming that the checks had been done." (ECF No. 57, at 9.)

In a vacuum, the defendants' failure to perform required checks may not have amounted to an "utter disregard of prudence." *Brown,* 270 Va. at 170, 613 S.E.2d at 410 (quoting *Frazier,* 234 Va. at 393, 362 S.E.2d at 691). But Singleton's complaint goes further. Singleton alleges that Bundick, Cooke, and Tadros were each subjectively aware of the danger that failing to conduct such checks posed to the inmates in their care. Indeed, the on-duty defendants each knew, *at a minimum,* that either Goode or Ellis had assaulted other prisoners in Dayroom 228 in the months, weeks, and days prior to their attack on Singleton. Singleton also claims that even if the on-duty defendants somehow did not know of the severe risk Ellis and Goode posed to him before the attack began, they knew or should have known "that a significant and violent disturbance was occurring." (ECF No. 42, at 12.) Singleton states that his "screams for help, as well as his banging and kicking," were "extremely loud," and he asserts that multiple witnesses will corroborate this

---

[25] Singleton claims that inmate witness interviews and surveillance footage confirm that neither Bundick nor either his deputies completed cell checks during the hours-long assault or responded to Singleton's loud and prolonged screams for help. (*Id.* at 6–7, 13.)

account. (*Id.* at 15.)  Further, he notes that forensic investigators later concluded that "while [a] detective posted in the hallway . . . could not discern what was being said, he . . . could hear the yelling and clearly hear multiple strikes on the door." (*Id.*)

Despite his limited access to information, *see supra* note 4, Singleton has plausibly alleged that Bundick, Tadros, and Cooke knew or should have known that Ellis and Goode posed a significant danger to other inmates housed in their cell and deliberately failed to perform cell checks or otherwise take any action which could have prevented or mitigated that danger. *Cf. Rucker v. Piedmont Regional Jail Authority*, 3:21cv412, 2021 WL 3863346, at *1–2 (E.D. Va. Aug. 30, 2021) (denying motion to dismiss claim that defendants owed the inmate plaintiff "a duty of care to protect him from reasonably identifiable threats by other inmates" and breached that duty by housing the plaintiff with another inmate "when it proved reasonably foreseeable that [the inmate] would violently assault the plaintiff").  Accordingly, the Court finds that Singleton's gross negligence claims against Bundick, Tadros, and Cooke survive.

### ii. Wade and Goetchius

In their motion to dismiss, Defendants Wade and Goetchius assert that neither "knew about Singleton prior to the assault, nor did they assign pre-trial detainees to dayrooms or cells." (ECF No. 49, at 10.)  In support, they cite *Reid*, 2014 WL 1493569.  In *Reid*, jail personnel failed to initiate suicide prevention policies when a high-risk inmate transferred into their facility.  The day after his arrival, the inmate died by suicide.  Upon a motion to dismiss filed by a defendant jail superintendent, the Court dismissed the plaintiff's claim for gross negligence, finding that the plaintiff failed to allege that the defendant was "present at the Jail during or after [the decedent's] transfer, . . . involved in any capacity in the Intake Procedures, or . . .communicated with any other Defendant." *Id.* at *6.  The Court finds this analog unpersuasive.

Unlike *Reid*, Singleton's claims turn on the defendants' knowledge of circumstances posing an obvious risk of serious harm to the inmates in the Jail. Here, Singleton alleges that Wade and Goetchius knew of a pattern of inmate assaults in Dayroom 228 and a systemic lack of supervision in the Jail. By deliberately turning a blind eye to that reality, the defendants subjected inmates including Singleton to an unnecessary risk of serious or fatal injury. Further, Singleton alleges that Goetchius specifically knew that inmates Good and Ellis posed a significant risk of harm to any detainee in their cell and took no action to address that risk, despite a duty to do so. Accordingly, based on this knowledge of dangerous prison conditions and the specific risk of harm to inmates housed in Dayroom 228, the Court finds that Singleton plausibly pleads a claim for gross negligence against both Wade and Goetchius and is thus entitled to develop the record necessary to prove his claims.

### b. Willful and Wanton Negligence (Count Two)

The theory of willful and wanton negligence differs from gross negligence because it requires a showing that the defendant acted in conscious disregard "of another person's rights or . . . with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 576 (E.D. Va. 2020) (quoting *Etherton v. Doe*, 268 Va. 209, 213–14, 597 S.E.2d 87, 90 (2004) (internal quotations and citations omitted)). *But see Alfonso v. Robinson*, 257 Va. 540, 545, 514 S.E.2d 615, 618 (1999) (stating that willful and wanton negligence "requires an actual or constructive consciousness that injury *will result* from the act done or omitted") (emphasis added) (citation omitted).

In his reply, Singleton withdraws his claims for willful and wanton negligence as to Defendants Wade and Goetschius. (ECF No. 55, at 10.) Accordingly, the Court will grant their

21

joint motion as to that claim.

### i. Bundick, Tadros, and Cooke

Singleton says that his "willful and wanton negligence claim rises and falls on the Court's acceptance of two key facts alleged in his complaint." (ECF Nos. 57, at 10; 59, at 10; 61, at 10.) First, Singleton alleges that various unidentified Jail personnel "knew Singleton was being placed in a cell with someone who would assault . . . or rape [him]," and that "they had made it known to the inmates he was housed with that [he] had allegedly assaulted his pregnant girlfriend." (ECF Nos. 57, at 10; 59, at 10; 61, at 10.) Second, Singleton alleges that the on-duty defendants intentionally forged "records documenting jail checks" on the night of his assault. (ECF Nos. 57, at 10; 59, at 10; 61, at 10.)

As an initial matter, the Court disagrees and finds that each on-duty defendant's failure to conduct cell checks, despite his knowledge of the dangerous conditions posed to the inmates in Dayroom 228, shows a reckless indifference to the probable consequence that an inmate in his care would be hurt or killed. Further, if true, Singleton's assertion that Jail personnel deliberately placed him in a cell with an inmate they believed would assault him demonstrates, at best, a total disregard for Singleton's welfare. The Court acknowledges that this allegation is based on an unidentified whistle-blower's statement and is thus necessarily vague. Nevertheless, the Court finds that when considered alongside the well-pleaded allegations that the on-duty defendants each forged cell-check records during the attack, Singleton's claims transcend mere conceivability and thus satisfy the standard of Rule 12(b)(6). Accordingly, the Court finds that Singleton pleads sufficient facts to support a claim of willful and wanton negligence against Bundick, Tadros, and Cooke and will deny their motions to dismiss that claim.

### B. Section 1983

#### 1. Failure to State a Claim

All of the defendants, except Sanders, also argue that Singleton's complaint fails to assert

a viable § 1983 claim against them.

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Although § 1983 provides Singleton's cause of action, the statute "'is not itself

a source of substantive rights.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker*

*v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Rather, § 1983 provides "a method for vindicating

federal rights elsewhere conferred." *Id.* (citing *Baker*, 443 U.S. at 144 n.3). Accordingly, a

plaintiff seeking to prevail under § 1983 must show both that (1) he was "deprived of a federal

statutory or constitutional right; and (2) the deprivation was committed under color of state law."[26]

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526

U.S. 40, 49–50 (1999).

The Court begins its analysis by identifying the precise constitutional or statutory violation

that the defendant allegedly committed. *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citing

*Graham*, 490 U.S. at 393–94). Here, Singleton alleges that the defendants violated both his Eighth

---

[26] "The traditional definition of acting under color of state law requires that the defendant
in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only
because the wrongdoer is clothed with the authority of state law.'" *West v. Adkins*, 487 U.S. 42,
49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Here, Singleton asserts
that each defendant, given their respective roles as employees at the Henrico County West Jail,
conducted all acts and omissions "within the scope of their official duties and employment." (ECF
No. 42, at 4–5 25–26.) Accordingly, the Court finds Singleton's pleadings allege a deprivation
under color of state law.

and Fourteenth Amendment rights by failing to protect him from harm "despite actual and constructive knowledge" of the risk that two fellow detainees posed to him. (ECF No. 42, at 25–26.)  Because pre-trial detainees are not prisoners, however, Singleton's claims are properly analyzed under the Fourteenth Amendment. *Westmoreland v. Brown*, 883 F. Supp. 67, 71–72 (E.D. Va. 1995).  Accordingly, the Court will grant the defendants' motions as to Singleton's Eighth Amendment claims.

The Due Process Clause of the Fourteenth Amendment affords pre-trial detainees a constitutional right to be free from punishment "prior to an adjudication of guilt in accordance with the due process of law." *Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535, 535 n.16 (1979)); *see also Westmoreland*, 883 F. Supp. at 71. While prison officials have a duty to protect pre-trial detainees from a substantial risk of serious injury, *Welty v. Meletis*, No. 3:16cv659, 2019 WL 1575189, at *4–6 (E.D. Va. Apr. 11, 2019), "not every assault suffered by an inmate at the hands of another inmate rises to the level of a constitutional violation,"[27] *Blackenship v. Virginia*, 432 F. Supp. 2d 607, 611 (E.D. Va. 2006). Rather, jail officials violate a detainee's constitutional due process rights when they demonstrate deliberate indifference to a substantial risk of serious injury at the hands of another inmate. *Welty*, 2019 WL 1575189, at *4–6.

Thus, to prevail, Singleton must demonstrate that: (1) he suffered an objectively serious injury or substantial risk of such injury, and (2) the defendants subjectively knew of and disregarded the risk. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302–03 (4th Cir. 2004). "[A] plaintiff can make a prima facie case under this standard by showing 'that a substantial risk of

---

[27] "[A] baseline risk of assault inherent in prison life does not support a constitutional claim." *Id.* at *4.

[serious harm] was long-standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it .'" *Parrish*, 372 F.3d at 303 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Further, an inmate may satisfy the deliberate indifference standard by alleging facts that indicate "the risk of serious harm [is] . . . substantial even though the *precise victim* . . . [is] not ascertainable." *Westmoreland*, 883 F. Supp. at 75 (emphasis added). Courts have also found deliberate indifference "where custodians . . . place prisoners in the same cell as an inmate known to have violent propensities." *Whaley v. Erickson*, 339 F. App'x 619, 622 (7th Cir. 2009) (citing *Brown v. Budz*, 398 F.3d 904, 914–15 (7th Cir. 2005)).

Singleton states that Ellis and Goode beat him for over three hours in Cell 2 in Dayroom 228. (ECF No. 42, at 6.) As a result, he suffered manifold injuries, and medical personnel had to place him into a medically induced coma. (*Id.* at 3.) Singleton asserts that Dayroom 228 was a large room with individual cells lining two levels. Although prisoners may freely move about the Dayroom prior to lockdown, after lockdown, each is confined to a small space with his cellmates. Accordingly, once an inmate is locked into his cell, he becomes utterly reliant on Jail personnel to "respond promptly to dangerous situations and calls for help." *Welty*, 2019 WL 1575189, at *5 (quoting *Bradford v. City of Chicago*, No. 16 C 1663, 2017 WL 2080391, at *3 n.4 (N.D. Ill. May 15, 2017). Singleton contends that Jail personnel, including Defendants Tadros, Cooke, and Bundick, routinely omitted cell checks, falsified logs, and ignored inmates, and that Defendants Goethius and Wade both knew of and permitted the common practice of omitting cell checks and forging records. Singleton also asserts that this common practice was well-understood by inmates, including Ellis and Goode. Accordingly, Ellis and Goode felt free to assault Singleton for hours

without fear of interruption.

Based on Goetchius's role as an investigator in the Jail and Wade's role in managing the operations of the Jail, the Court may infer that each was subjectively aware of the prevalence of inmate assaults occurring in Dayroom 228, including the assault committed by Ellis less than two weeks before the attack on Singleton. Singleton also specifically alleges that each of the on-duty defendants knew of an obvious risk that he would be seriously injured because both Ellis and Goode had recently committed serious assaults on other inmates. Jail personnel placed Goode in isolation for eleven days following his assault of a cellmate, and Ellis's assault on another detainee approximately ten days before his attack on Singleton triggered a discussion on the Prison Rape Elimination Act. (ECF No. 42, at 10–11.) Further, Ellis openly discussed his desire to harm or kill another inmate and was housed at the jail awaiting trial for charges related to "a multiple day abduction where Ellis [allegedly] . . .beat[] and tortured [his] victim." (*Id*. at 9.) Singleton asserts that Defendants Cooke, Tadros, and Bundick each had personal knowledge of at least some of these events. Despite these incidents, the on-duty defendants continued to omit cell checks, leaving prisoners unsupervised and without access to aid for prolonged periods of time. *See Westmoreland*, 883 F. Supp. at 74; Welty, 2019 WL 1575189, at *5. Based on their knowledge of prior assaults, the Court finds that there is sufficient evidence that the on-duty defendants drew the rational inference that long periods without supervision increased the risk that an inmate would be seriously injured.

Further, Singleton asserts that despite loud and repeated calls for aid, the on-duty defendants failed to respond or otherwise intervene in the attack for over three hours. He grounds this claim in allegations that multiple witnesses overheard the loud assault and that an after-the-fact investigation concluded that Jail personnel could have heard his screams from the hallway

26

outside of Dayroom 228.

Finally, Singleton adequately posits a nexus between the on-duty defendants deliberate indifference to the risk of harm and the eventuality of Singleton's injuries. Absent their failure to perform cell-checks or otherwise render timely aid, Singleton contends that Ellis and Goode could not have assaulted him without interruption for over three hours.[28]

Though some of the claims presented in Singleton's complaint are thin—namely those against Defendants Cooke and Goetchius—the Court finds that Singleton has plausibly pleaded that he was incarcerated under conditions which posed a substantial risk of serious harm and that the defendants each acted with deliberate indifference to that risk.

## 2. *Qualified Immunity*

Finally, other than Sanders, each defendant argues that he is entitled to qualified immunity. (*See* ECF Nos. 44, at 20–23; 46, at 18–21; 49, at 18–20; 50, at 16–18.) The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987) and *Gooden v. Howard County,* 954 F.2d 960, 968 (4th Cir. 1992) (en banc)).

Since qualified immunity operates as immunity from suit, and not merely a defense to

---

[28] Singleton also alleges that Jail personnel intentionally housed Singleton with known dangerous inmates and then intentionally leaked information regarding Singleton's charges to those men. The Court finds that Singleton's claims do not rise and fall on these allegations, but notes that such allegations lend credence to Singleton's assertions that the dangers posed by Ellis and Goode were well-known or otherwise obvious to the specific Jail employees tasked with supervising them.

liability, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), a court should generally rule on its application "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage," however it "is peculiarly well-suited for resolution at the summary judgment stage." *Willis v. Blevins,* 966 F. Supp. 2d 646, 652 (E.D. Va. 2013) (quoting *Tobey v. Jones*, 706 F.3d 379, 393–94 (4th Cir. 2013)); *Monk v. Gulick*, No. 3:20cv518, 2021 WL 1265205, at *6 (E.D. Va. Apr. 6, 2021) (denying the defendants' motion to dismiss on qualified immunity grounds because deciding whether they acted reasonably "requires greater factual development and is better decided once discovery has been conducted" (quoting *Tobey*, 706 F.3d at 389)).

The Court applies an objective, two-part inquiry to determine "whether a government official has violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (quoting *Harlow*, 457 U.S. at 818). "To escape dismissal of a complaint on qualified immunity grounds, a plaintiff must (1) allege a violation of a right (2) that is clearly established at the time of the violation." *Evans v. Chalmers*, 703 F.3d 636, 646 (4th Cir. 2012); *see also Roncales v. County of Henrico*, 451 F. Supp. 3d 480, 495 (E.D. Va. 2020) (citing *Tobey*, 706 F.3d at 386–87) (stating that "to survive a qualified-immunity based 12(b)(6) motion to dismiss," a plaintiff "must have plausibly alleged in his complaint that his constitutional rights were violated"). Officials are entitled to qualified immunity unless a plaintiff satisfies both prongs of the test. *Long v. Beres*, No. 3:10cv532, 2012 WL 405069, at *2 (E.D. Va. Feb. 8, 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)). The Court "exercise[s] [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the

28

circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Here, the Court first considers "whether a constitutional right would have been violated on the facts alleged." *Katz*, 533 U.S. at 200; *see Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). Because the Court finds that Singleton's complaint sufficiently pleads a Fourteenth Amendment claim for relief, it must determine whether a reasonable person in the defendant's position would know, at the time of the violation, that his actions would violate a clearly established right. *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he was doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). This analysis "depends on the law of the relevant jurisdiction." *Occupy Columbia v. Haley*, 738 F.3d 107, 124 (4th Cir. 2013).

### a. Violation of a Constitutional Right

As discussed above in Section III.B.1., Singleton's complaint sufficiently pleads a claim that the defendants violated Singleton's Fourteenth Amendment rights. The Court finds that the on-duty defendants' willful failure to perform cell checks or otherwise take any action to ensure the safety of a detainee housed "in the same cell as [two] inmate(s) known to have violent propensities," cannot reasonably be termed "bad guesses in gray areas." *Whaley*, 339 F. App'x at 622; *Maciariello*, 973 F.2d at 298. The Court finds the defendants' arguments to the contrary meritless and, accordingly, denies their motions to dismiss on this ground.

Similarly, the Court finds that Singleton posits just enough facts to plead that Defendants Wade and Goetchius both turned a willful blind eye to the near certainty that sooner or later a detainee in their care would suffer the grave consequences of obviously dangerous conditions within the Jail. Thus, the qualified immunity analysis proceeds to the second prong.

29

### b. Clearly Established Constitutional Right

The Court "does not need to find 'a case directly on point,'" in order to hold that a right is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate,'" *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)), such that it would give the defendants "fair warning that their conduct was wrongful." *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Williamson*, 912 F.3d at 187). "[T]he constitutional right allegedly violated must be clearly defined in a concrete factual situation such that its contours are clear, unmistakable, and applicable to the precise conduct at issue." *Altamira-Rojas v. City of Richmond*, 184 F. Supp. 3d 290, 294 (E.D. Va. 2016) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

Singleton's claims and the rights he asserts therein were clearly established by August 2019. *See Smith v. Hardy*, No. 7:14cv00477, 2015 WL 5562197, at *7 (W.D. Va. Sept. 21, 2015) (recognizing that a claim based on the defendant's failure to protect the plaintiff from assault by a fellow inmate as clearly established); *McFadden v. Allison*, No. WDQ–08–0154, 2009 WL 3247358, at *5 (D. Md. Oct. 9, 2009) (finding that a pre-trial detainee's right "to be free from prison officials' deliberate indifference to . . . assaults by other inmates" was "clearly established" as of 2006); *see also Rucker*, 2021 WL 3863346, at *6 ("[T]he duty of correctional officers to protect inmates from violence by another inmate is well-settled by existing law. Furthermore, case law addressing this issue makes it clear that a correctional officer cannot willfully ignore information showing that an inmate would be subjected to a substantial risk of violence from another inmate if housed in the same unit as him.").

### 3. *Supervisory Liability*

Singleton's final claim asserts that Defendants Wade, Goetchius, and Bundick each knew of and tacitly approved a policy or custom of omitting cell checks and falsifying records in violation of ACA standards. He contends that "the aforementioned policy and custom, combined with the supervisors' individual . . . failure to take remedial action to eliminate such behavior once known, caused the jail employees who adopted the custom to violate Singleton's constitutional rights and amounted to deliberate indifference on the part of each . . . defendant." (ECF No. 42, at 27–28.)

> [T]o establish supervisory liability under § 1983 [a plaintiff must establish]: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994) (internal quotations omitted).[29]

The Court need not rehash the facts alleged against the defendants save to note that the Court finds plausible the allegations that Wade, Goetchius, and Bundick knew of "conduct engaged in by [their] subordinate[s]" that posed "a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Shaw*, 13 F.3d at 799. Further, the well-pleaded facts are that each defendant—despite their knowledge of the dangers posed by a lack of supervision in the Jail—took no steps to remedy the problem or otherwise guard Singleton from harm. But for that

---

[29] When a plaintiff asserts a claim "against a public official in h[is] individual capacity, to hold the official liable for h[is] subordinate's conduct, that 'conduct must meet the test for supervisory liability.'" *Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (quoting *Mikkelsen v. DeWitt*, 141 F. App'x 88, 90 (4th Cir. 2005)).

failure, Singleton's injuries would have been avoided or mitigated. Accordingly, the Court will allow Singleton's supervisory liability claims to proceed as to all three defendants.

## IV. **CONCLUSION**

For the reasons outlined above, the Court finds that Singleton's complaint plausibly asserts claims for gross negligence and a violation of his Fourteenth Amendment rights against each of the defendants. The Court further finds that Singleton pleads a claim for willful and wanton negligence against Defendants Tadros, Cooke, Bundick, and Sanders. Finally, the Court finds that Singleton adequately pleads a claim for supervisory liability against Defendants Wade, Goetchius, and Bundick. Because Singleton abandons his official capacity claims against Defendants Wade, Goetchius, and Bundick, and his willful and wanton negligence claims against Defendants Wade and Goetchius, the Court will dismiss those claims.[30]

An appropriate Order shall issue.

Let the Clerk mail a copy of this Opinion to all counsel of record.

Date: 19 September 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

---

[30] The Court offers no opinion on the prudence of abandoning such claims.